**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 09-cv-02254-CMA-BNB

WARREN MILLER ENTERTAINMENT, INC., a Delaware corporation,

      Plaintiff,

v.

LEVEL 1 PRODUCTIONS, INC., a Colorado limited liability company,

      Defendant,

and

WARREN MILLER COMPANY, LLC, a Washington limited liability company, and
WARREN MILLER, individually, a Washington resident,

      Third-Party Intervenors.

---

**ORDER GRANTING MOTION TO INTERVENE AND PLAINTIFF'S MOTION TO STAY**
**PROCEEDINGS PENDING ARBITRATION**

---

This matter is before the Court on a Motion to Intervene filed by Warren Miller

Company, LLC and Warren Miller, individually, (Doc. #11) in the above trademark

infringement and right of publicity dispute and Plaintiff Warren Miller Entertainment's

Motion to Stay Pending Arbitration (Doc. #22).  The Court has reviewed the parties'

submissions and, for the following reasons, ORDERS that the Motion to Intervene and

the Motion to Stay are GRANTED.

I.    **Background**

On September 21, Plaintiff Warren Miller Entertainment ("WM Entertainment")
filed a Verified Complaint for Trademark Infringement and Motion for Injunctive Relief
against Defendant Level 1 Productions, Inc. concerning Level 1's use of the name,
voice, and likeness of Warren Miller, a legendary ski and snowboard filmmaker, in its
recent movie, *Refresh*, which is a ski and outdoor adventure film dedicated to footage of
park, urban, and big-mountain skiing.  WM Entertainment is a producer and distributor
of sports and industrial videos, commercials, and contract films.  Level 1 is in the
business of producing and distributing motion picture films containing ski, snowboard,
and related alpine/adventure sports footage.

WM Entertainment contends that *Refresh* is the same kind of film that it produces
and that Level 1's use of Warren Miller's name in *Refresh* infringes WM Entertainment's
rights in the registered trademark, WARREN MILLER (Reg. Nos. 2,096,710 and
3,317,579).[1] For more than 20 years, WM Entertainment has used the WARREN

---

[1] In pertinent part, the '710 registration is for "motion picture films and prerecorded video tape
and/or discs on the subject of travel and sports and computer software containing sports footage and
travel footage" (hereinafter, the "WARREN MILLER Video Mark").  The '579 registration is for "providing
on-line information in the field of sports, skiing, athletic competitions, films, snow-related sports, and
music," among other services (hereinafter, the "WARREN MILLER Web Mark").

WM Entertainment also asserts rights to the marks, WARREN MILLER PRODUCTIONS,
WARREN MILLER ENTERPRISES, WARREN MILLER FILMS, and WARREN MILLER
ENTERTAINMENT (hereinafter, the "WARREN MILLER Marks").

MILLER Mark and trade name to identify its brand of outdoor winter sports films, which it produces and screens on an annual basis.

The dispute hinges upon two separate November 1988 Purchase Agreements between WM Entertainment's predecessor-in-interest and two of Warren Miller's companies, Warren Miller Productions, Inc. and Warren Miller Enterprises, Inc. Pursuant to these Purchase Agreements, WM Entertainment acquired all rights to the WARREN MILLER Marks and other intellectual property.  The 1988 Agreements also contained a non-compete clause, which stated in pertinent part:

> "WMP hereby covenants...that neither WMP nor its officers, directors and shareholders will at **any time within a five year period immediately following January 1, 1989**, directly or indirectly, through any firm, corporation or business, engage in any business activity related to individual enthusiast sports...[which include] without limitation, snow skiing...The proscribed business activities include any use or involvement with audio visual media, including without limitation...film...motion pictures."  (Doc. # 12, Ex. 2, p. 8-10, ¶ 9) (emphasis added).

Subsequent to the Purchase Agreements, Warren Miller entered into a series of separate Independent Contractor Agreements with WM Entertainment's predecessor-in-interest over a period of 10 years; the subsequent independent contractor agreements were modifications of the first one.  Pursuant to these Agreements, Miller continued to write and record narration for WM Entertainment's predecessor's annual lecture films, associated promotional materials, and two additional short films each calendar year.

3

The parties entered into agreements on January 1989 and March 1995, with a final Agreement commencing on January 1, 1998 and ending on December 31, 1999.

The first independent contractor agreement lasted from January 1, 1989 through December 31, 1994.  This Agreement contained a non-compete clause with respect to Mr. Miller that mirrored the non-compete clause in the 1988 Asset Purchase Agreement. (See Doc. #12, Ex. 2, p. 42-46, ¶ 6).  With respect to Mr. Miller's right of publicity, the Agreement stated that:

> "During the term of this Agreement, [WM Entertainment's predecessor-in-interest] shall be the exclusive representative for [Mr. Miller] for personal product endorsements and appearances..." (Id. at p. 46, ¶ 7).

The March 1995 Agreement, which expired at the end of 1999, "clarifie[d] [WM Entertainment's] rights regarding the Warren Miller name, his personal endorsement, his voice, and likeness, as they pertain to the business, that [WM Entertainment] currently owns through its existing purchase agreements with Warren Miller Enterprises and Warren Miller Productions." (Id. at p. 52, ¶ 2).  The Agreement also expressly stated that:

> "[WM Entertainment] owns the exclusive right, in perpetuity, in all media, to the name, the personal endorsement, use of voice, and the likeness of Warren Miller, when used with its existing business, and the fruits of its related efforts." (Id. at ¶ 2).

and

> "For so long as the 'Independent Contractor Agreement is in effect Warren Miller will not engage in any outside business activities that compete with [WM Entertainment] or its sponsors." (Id. at ¶ 3).

The final agreement, with a retroactive effective date of January 1, 1998, contained a

Covenant-Not-To-Compete, which stated:

> "For so long as this Agreement is in effect Warren Miller will not engage in any outside business activities that compete with [WM Entertainment] or its sponsors." (Doc. #12, Ex. 2, p. 56, ¶ 3).

This agreement also reaffirmed that "[WM Entertainment] owns the exclusive right, in

perpetuity, in all media, to the name, the personal endorsement, use of voice, and the

likeness of Warren Miller, only when used with its existing business, and the fruits of its

related efforts."

The Agreement also contained a provision concerning Warren Miller's use of his

own name:

> "The intention of this Agreement is also to clarify and agree that Warren A. Miller is free to use his own name however he desires so long as he does not infringe upon the exclusive rights described in Paragraph 2 [the exclusivity provision], and the covenant not to compete described in Paragraph 3 [non-compete for duration of the Agreement] below." (Id. at p. 55).

Finally, the Agreement contained an arbitration provision, requiring the parties to

arbitrate any disputes arising from the Agreement. (Id. at p. 56).

In its Verified Complaint, Plaintiff specifically objects to Defendant's following use of Warren Miller's name, voice, image, and likeness:

    A.    Use of Warren Miller's name in conjunction with the promotion and publicity of the film *Refresh*.

        1.    Use in a press release regarding the "surprise participation from icon Warren Miller" in the film *Refresh* and "Bringing in Warren Miller to share his thoughts, words, and perspective is the ultimate way for us to bridge the gap between our younger core audience, and the more traditional ski film fans").

        2.    Use in a "tweet" on Twitter.com: "Full Refresh World Premiere coverage at www.level1productions.com story, photos, video, and quotes from Warren Miller!"

    B.    Use of Warren Miller's name, voice, and likeness in the film, itself:

        1.    At the start of the film, Warren Miller's image and name appears on the screen

        2.    Warren Miller narrates much of the film

        3.    At the end of the film, he states, "I am Warren Miller"; and

        4.    In the film's credits, "Warren Miller" appears under the caption, "Special Guest"

The film *Refresh* was made pursuant to a September 2009 Personal Services Contract between Defendant and Warren Miller Company, LLC, a company owned by Mr. Miller.  (Doc # 12, Ex. 2, p.58-61).  By way of this Contract, Warren Miller Company granted Level 1:

> "such rights it may have in Miller's name,
> voice, image, or likeness and to use such
> rights in the production and distribution
> (including advertising and promotion) of
> [*Refresh*]". (Id. at ¶ 3(a)).

WM Entertainment initially sought a Temporary Restraining Order to stop Level 1's showing of *Refresh* in various cities through mid-October of this year.  The Court denied the TRO on September 22, 2009 (Doc. # 8).  WM Entertainment has since withdrawn its request for an immediate hearing on the motion for preliminary injunction (Doc. # 22 and 30).

## II.   The Motion to Intervene

On September 25, 2009, pursuant to Fed. R. Civ. P. 24, Warren Miller Company, LLC and Warren Miller filed a Motion for Leave to Intervene in the instant case.  (Doc. #11).

Warren Miller contends that he has been free to use his name, voice, image, and likeness (i.e., his rights of publicity), since December 31, 1999 (the expiration date of the final independent contractor agreement) and, in fact, has entered into a number of agreements with third parties over the last ten years, in which he lends his name, voice, and likeness, such as he did with Defendant. (Id. at 3).

Warren Miller contends that the Court should allow him and Warren Miller Company to intervene either as a matter of right, under Rule 24(a) or via permissive intervention, under Rule 24(b).

### A.    Standard for Intervention

Under Fed. R. Civ. P. 24(a), a third party may intervene as a matter of right where it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  The Tenth Circuit has set forth a four-part test based on this rule: (1) the motion to intervene must be timely, (2) the motion "claims an interest relating to the property or transaction which is the subject of the action," (3) the interest "may as a practical matter" be "impair[ed] or impede[d]," and (4) which interest "is [not] adequately represented by existing parties."  Elliott Indus. Ltd. v. BP Am. Prod. Co., 407 F.3d 1091, 1103 (10th Cir. 2005) ("The Tenth Circuit generally follows a liberal view in allowing intervention under Rule 24(a).")  A third party may seek permissive intervention under Rule 24(b) if it has "a claim or defense that shares with the main action a common question of law or fact."

In the instant litigation, Mr. Miller contends that he has "protectable interests that would be significantly impacted by the disposition of this case" and, therefore, should be allowed to intervene as a matter of right.  (Doc. # 11 at 3).

### B.    Intervention is Warranted

Plaintiff opposes intervention as a matter of right by either Mr. Miller or Warren Miller Company, LLC, contending that their interests will not be impaired or impeded

and that their interests are adequately represented by existing parties because the complaint raises issues "which relate solely to [Defendant]'s unauthorized use of Plaintiff's registered WARREN MILLER Mark".  (Doc. #22 at 11).  In other words, Plaintiff contends that it was not seeking a determination of the contract rights between it and Mr. Miller, but, rather whether Defendant's alleged use of the WARREN MILLER Mark in and in connection with the movie *Refresh* "constituted a legitimate act of identification, or an illegal effort to traffic in the goodwill associated with the WARREN MILLER Mark," which would cause [Plaintiff] to lose control over the Mark and would be "devastating to a huge part of [Plaintiff's] business".  (Id. at 11-12).  For these reasons, Plaintiff contends that only its and Defendant's interests are at issue.

        Plaintiff also opposes the third parties' permissive intervention.  Plaintiff contends that the defenses Mr. Miller wishes to add are "based upon rights he claims to have received in various contracts, which...are exclusively subject to arbitration." (Id. at 12). In particular, the original Purchase Agreements (which were modified and extended by each of the subsequent independent contractor agreements) contain an arbitration provision that states:

>        "In the event of any dispute or controversy as between the parties hereto, the same shall be submitted to arbitration under the rules of the American Arbitration Association or such other arbitration process as may be mutually agreed upon, in writing, by the parties."  (Doc. # 12, Ex. 2, p. 17, ¶ 22).

The Court disagrees with Plaintiff.  Mr. Miller and Warren Miller Company are entitled to intervene as a matter of right.  The rights Warren Miller Company conveyed to Defendant in the September 2009 contract are central to the instant litigation.  Mr. Miller believed he could convey rights in his name, voice, image, or likeness pursuant to his interpretation of the prior independent contractor agreements and Purchase Agreements with Plaintiff and Plaintiff's predecessor-in-interest.  Mr. Miller's name, voice, image, or likeness are the properties that are the subject of the instant litigation.  A finding of trademark infringement or infringement of a right of publicity against Defendant would certainly impair or impede Mr. Miller's interests in the aforementioned properties as well as his and Warren Miller Company's commercial interests with Defendant.  No existing party adequately represents these interests.  Therefore, the Court **GRANTS** Mr. Miller's and Warren Miller Company's Motion to Intervene (Doc. #11) as a matter of right.  Accordingly, the Court need not consider whether permissive intervention under 24(b) is appropriate.

**III.     Plaintiff's Motion to Stay Pending Arbitration[2]**

---

[2] Pursuant to the Court's Local Rules, Plaintiff should not have filed its Motion to Stay as part of its Response to the Motion to Intervene (Doc. #22).  (L.R. 7.1(c): "A motion shall not be included in a response or reply to the original motion.  A motion shall be made in a separate paper.") For the sake of judicial efficiency, the court will overlook this failure to comply with the Local Rules and will not strike the request, but will rule on the merits.  However, counsel is directed to familiarize themselves with the Local Rules and follow them in the future.

Plaintiff implicitly concedes the import of Mr. Miller's asserted rights by seeking a stay of this action pending arbitration between Plaintiff and Mr. Miller in accordance with the arbitration provisions of the various Agreements.  <u>See</u> Federal Arbitration Act, 9 U.S.C.A. § 3 ("the court in which suit is pending...shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement [provided that the litigated issue is referable to arbitration]").  Defendant objects to a stay of the proceedings and cites to a string of case law outside the Tenth Circuit to support its position that the action should be dismissed without prejudice pending the arbitration.[3]

Courts in the Tenth Circuit have long held that actions must be stayed, rather than dismissed, pending arbitration.  <u>See</u> <u>Adair Bus Sales, Inc. v. Blue Bird Corp.</u>, 25 F.3d 953, 955 (10th Cir. 1994); <u>Willingham v. Omaha Woodmen Life Ins., Soc'y</u>, No. 9-cv-00090, 2009 U.S. Dist. LEXIS 73411, at *3 (D. Colo. Aug. 19, 2009) (granting motion to compel arbitration and noting the requirement to stay the case pending arbitration, per 9 U.S.C. § 3); <u>Pierce v. Kellogg, Brown & Root, Inc.</u>, 245 F. Supp. 2d 1212, 1215 (E.D. Okla. 2003); <u>Pioneer Props., Inc. v. Martin</u>, 557 F. Supp. 1354, 1362-1366 (D. Kan. 1983) (choosing to stay rather than dismiss as required under 9 U.S.C. § 3).

---

[3] Defendant, Mr. Miller, and Warren Miller Company also seek dismissal because of the "ongoing injury" that would ensue by having the litigation continue to hang over their heads.  (<u>See</u> Doc. #24 at 4 and #31 at 3).

In the instant matter, the Court sees no reason to depart from this well-established precedent.  Though Defendant is not a party to the contracts between Plaintiff and Mr. Miller that contain the arbitration provisions, the instant litigation and the "Plaintiff-Mr. Miller" contracts both concern Mr. Miller's use of his name, image, and likeness for commercial, non-commercial, and/or fair use purposes.  Thus, the extent to which Mr. Miller may use and license/assign the rights to use his name, voice, image, and likeness is inextricably linked to the issue raised in the instant case.  Accordingly, it is

ORDERED that Warren Miller and Warren Miller Company's Motion to Intervene (Doc. # 11) is GRANTED.   It is

FURTHER ORDERED that the Preliminary Injunction Hearing and associated briefing schedules are VACATED and Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order (Doc. #2) is DENIED WITHOUT PREJUDICE.   It is

FURTHER ORDERED that the instant matter is immediately stayed until arbitration between Plaintiff and Mr. Miller has been completed, and the case will be administratively closed until such time as the Plaintiff files a Notice with the Court regarding the outcome of the arbitration, which Notice shall be filed within 10 days of issuance of the arbitration decision.  It is

FURTHER ORDERED that the Preliminary Injunction Hearing set for October 22, 2009, at 9:00 a.m. is VACATED.

DATED: October 20, 2009.

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge